**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| REBECCA JOHNSON, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:11-CV-01106 (VLB) |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| ADMINISTRATIVE SERVICES, | : | |
| DEFENDANT. | : | September 13, 2013 |

<u>MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [Dkt. #38]</u>

I.      <u>Introduction</u>

The Plaintiff, Rebecca Johnson ("Johnson"), brings this failure-to-hire

action against the Defendant State of Connecticut Department of Administrative

Services ("DAS") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000e, et seq.  Before the Court is the Defendant's Motion for Summary

Judgment.  For the reasons that follow, the Defendant's Motion for Summary

Judgment is GRANTED.

II.      <u>Local Rule 56 Statements</u>

As an initial matter, the Court notes that Plaintiff has failed to comply with

the Federal Rules of Civil Procedure for asserting and contesting facts on a

motion for summary judgment.  The Rules provide that

> (c)(1) [a] party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by: (A) citing to particular

parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. (2) A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. (3) The court need consider only the cited materials, but it may consider other materials in the record. (4) An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

(e) If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(c)-(e).

In order to defeat a motion for summary judgment a plaintiff must create more than a "metaphysical" possibility that his allegations were correct; she must "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574,

586–87 (1986) (internal quotation marks omitted). "In order to defeat a motion for summary judgment that is properly supported by the evidence contemplated in Federal Rule of Civil Procedure 56(e), 'the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried. He cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" *Powell v. Donahoe*, 519 F. App'x 21, --, 2013 WL 2396011, at *1 (2d Cir. 2013) (quoting *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir.1996)).

Rule 56(a) of the Local Rules of Civil Procedure for the District of Connecticut makes clear the procedure for prosecuting and opposing a motion for summary judgment. A party filing a summary judgment motion must annex a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)1. Local Rule 56(a)2 further makes the opponent's duty abundantly clear by stating that a party opposing a motion for summary judgment must file an answering document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried." D. Conn. L. Civ. R. 56(a)2. Each statement of material fact in a Local Rule 56(a)1 or Local Rule 56(a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would

be admissible at trial." D. Conn. L. Civ. R. 56(a)3. The Local Rule further clarifies that "[a]ll material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party." D. Conn. L. Civ. R. 56(a)1. Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted. *See SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).

In support of its motion for summary judgment, the Defendant filed a Local Rule 56(a)1 statement with specific citations to evidence in the record. The Plaintiff, however, has failed to include any citation to evidence in the record in her 56(a)2 denials of facts alleged to be undisputed by the Defendant.[1] Further, Plaintiff has not denied many of the statements in the Defendants' 56(a)1 statement, admitting instead that she unable to admit or deny them for various reasons. The motion for summary judgment was filed after the discovery deadline and the Plaintiff has not filed any discovery motions suggesting that the Defendant has failed to meet its discovery obligations. Finally, the portion of the Plaintiff's 56(a)2 statement, entitled "Plaintiff's 56(b) Statement of Disputed Facts" is blank, indicating her awareness of the need to list such facts and her lack of knowledge of any such facts. [Dkt. 47, P's 56(a)2 Stmnt. p. 5].

---

[1]  Indeed, the Plaintiff has attempted to deny certain of these facts by conclusorily asserting that various defendants are liars and racists without supporting her conclusion with any facts from which her subjective belief could be weighed or objectively substantiated. *See, e.g.*, Dkt. 47, P's 56(a)2 Stmnt. ¶¶46-48, 54, 56.

Where the Plaintiff has objected to Defendant's facts but has failed to support her objection with any admissible evidence in the record, where the record itself does not support Plaintiff's denials, or where the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted. Where a statement is not supported by the record, the Court either notes such or does not rely on the purported fact in its determination. *See Buell v. Hughes*, 568 F. Supp. 2d 235, 237 (D. Conn. 2008) on reconsideration, 596 F. Supp. 2d 380 (D. Conn. 2009) (plaintiffs' response that they "lack[ed] sufficient information to agree or disagree" with defendant's facts was an improper denial under Rule 56(a)2, as it neither agreed with nor denied the defendant's statements); *Henton v. City of New London*, CIV.3:06 CV 2035 (EBB), 2008 WL 2185933 (D. Conn. May 23, 2008) (same); *Knight*, 2006 WL 1438649 (deeming admitted defendant's undisputed facts where plaintiff responded that he "ha[d] no knowledge" of or "disagree[d] with" the statements and where he offered no evidence in dispute); *Walton v. State of Conn., Dep't of Soc. Servs.*, 3:03CV2262 JBA, 2006 WL 533793 (D. Conn. Mar. 2, 2006) (deeming admitted defendant's material facts where plaintiff claimed insufficient knowledge to respond and offered no evidence to dispute facts); *Reynolds v. Town of Suffield*, 3:10CV1528 JBA, 2012 WL 3135896, at *1 n.1 (D. Conn. July 31, 2012) (deeming admitted facts that were supported by the evidence where non-moving party failed to cite to admissible evidence to support denials). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (holding that Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

III. <u>Factual Background</u>

On March 3, 2006, the Connecticut Department of Administrative Services ("DAS") posted a Job Announcement for two Human Resources Consultant positions assigned to the Statewide Human Resources Management Unit. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶1; Dkt. 38-5 (pp.1-2) (Exh. B), Job Announcement]. Qualified candidates would be "energetic, knowledgeable, and business minded HR professionals" who could provide "HR management services to state agencies in the areas of recruitment, business rules, employee relations, employee development, and staffing." [Dkt. 38-5 (pp.1-2) (Exh. B), Job Announcement]. The Announcement specified that "[t]hese positions may be filled at the HR Consultant (MP57) level or as a Leadership Apprentice" and listed the following methods for eligibility:

- Candidate has applied for and passed the Personnel Officer 1 exam and is on the current certification list promulgated by the [DAS] for this classification. OR
- State employees currently holding the above title or those who have previously attained permanent status may apply for lateral transfer. OR
- Qualified for the <u>Leadership Apprentice Program</u>.

[Dkt. 38-5 (pp.1-2) (Exh. B), Job Announcement (emphasis in original); Dkt. 38-1, D's 56(a)1 Stmnt. ¶1]. The Announcement required successful candidates to be "analytical, organized, team and customer oriented, self-directed and results focused," with strong computer and written and oral communication skills. [Dkt.

38-5 (pp.1-2) (Exh. B), Job Announcement ].  After the Job Announcement was published, DAS received approval to fill a third identical vacancy.  [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶16; Dkt. 38-1, D's 56(a)1 Stmnt. ¶2].

To be considered for hire directly into the Human Resources Consultant ("HRC") position, a candidate was required to either have taken and passed the Personnel Officer 1 exam, to currently be employed as a Human Resources Consultant, or to previously have held the job of HRC for at least six months.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶11].  Candidates who did not meet these requirements could still be eligible for the opening if they met the requirements for the Leadership Apprentice Program, a one to three year training program in which candidates could become qualified to move to the position of Human Resources Consultant at a junior working level (classified as MP57).  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶12].  Applicants were eligible for the Leadership Apprentice Program if they could "meet the experience and training requirements of the target class [here, HRC at the junior working level] within the three year training period."  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶13; Dkt. 38-5 (pp.15-18) (Exh. E), LA Job Desc. p. 1].

To have been qualified as a Human Resources Consultant at the junior working level, a candidate must have had "[s]ix (6) years of professional experience in classification, compensation, job evaluation, recruitment, examination, selection or closely related areas in the field of human resources management."  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶14; Dkt. 38-5 (pp.8-14) (Exh. D), HRC Job Desc.].  A candidate could also substitute up to four years of college credits

for the six years of experience required for the HRC position, and could substitute one additional year if the candidate possessed a Master's Degree in public administration, human resources management, or another closely related field.[2]  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶¶38, 39; Dkt. 38-5 (pp.8-14) (Exh. D), HRC Job Desc. p.2].  Neither the LA or HRC job descriptions, nor the Job Announcement for the positions, list a college or advanced degree as a requirement.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶35].

Thus, candidates were eligible to apply for the positions posted if they could demonstrate sufficient human resources management experience, or educational substitutes, such that they would be able to meet the six year experience requirement for the HRC position within three years of entering the Leadership Apprentice training program.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶¶15, 36]. The minimum qualifications, required knowledge, skill and ability for the LA position included

> Considerable managerial aptitude; considerable oral and written communication skills; interpersonal skills; considerable ability to understand and apply state and federal laws, statutes and regulations; considerable ability to analyze and solve problems; considerable ability to effect and manage change; considerable ability to plan for an implement excellent customer service; considerable ability to learn a new knowledge base; considerable ability to learn and apply policy and procedure.

---

[2] The HRC Job Description states "College training may be substituted for the General Experience on the basis of fifteen (15) semester hours equaling one half (1/2) year of experience to a maximum of four (4) years for a Bachelor's degree." [Dkt. 38-5 (pp.8-14) (Exh. D), HRC Job Desc. p.2].

[Dkt. 38-5 (pp.15-18) (Exh. E), LA Job Desc. p. 1].

Dr. Pamela Libby, Director of the Statewide Human Resources Management Division at the DAS, has affirmed that hiring Leadership Apprentices as opposed to HRCs was appealing because DAS could then structure the LA training programs to allow the Leadership Apprentices to be cross-trained to rotate through the different units within the Statewide Human Resources Management Division to determine the best fit for each hire, and to cross-train each Apprentice so that they could then replace HRCs who would be retiring in the next few years. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶9. Moreover, some of the duties that DAS needed the new hires to perform were administrative in nature, such as posting and supporting the Human Resources Certificate training program, assisting in application review, and processing exams. [*Id.* at 17]. Additionally, hiring Leadership Apprentices was a less expensive option for the State than hiring lateral transfers or promotions. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶10].

DAS received 26 applications in response to the Job Announcement, including the Plaintiff's, all of which were forwarded to and reviewed by Dr. Libby. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶18; Dkt. 38-1, D's 56(a)1 Stmnt. ¶¶3,4; Dkt. 38-6 (pp.11-13) (Exh. M), Aff. Action App. Flow and Selection Report]. Of the 26 applicants, eleven were eligible for direct entry into the Human Resources Consultant position and the remaining fifteen sought entry into the Leadership Apprentice program.[3] [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶¶19,20; Dkt. 38-1,

---

[3] The applicants eligible for direct entry into the HRC position, with each applicant's race noted, were Louis Daevis (black), Michele Joyce (white), Charles

D's 56(a)1 Stmnt. ¶¶50, 51]. Dr. Libby selected five individuals to interview, each of whom had applied for a Leadership Apprentice position, and all of whom were white: Daniel Curry, Michael Cosgrove, Suzanne Kaswan, Daniel Moreland, and Mark Tendler. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶4]. Libby then gave the applications to Keith Anderson, a Statewide Human Resources Manager responsible for the Reemploymenet/SEBAC unit within the Statewide Human Resources Management Division within DAS, for review. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶26; Dkt. 38-5 (pp.59-60) (Exh. J), Anderson Aff. ¶¶3, 5; Dkt. 38-1, D's 56(a)1 Stmnt. ¶5]. Anderson has affirmed that he agreed with the five applicants that Libby chose, and also proposed interviewing Lisa Jaser and Teresa Vachon, who Libby agreed to add to the list of interviewees, and both of whom are white. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶26; Dkt. 38-5 (pp.59-60) (Exh. J), Anderson Aff. ¶6; Dkt. 38-1, D's 56(a)1 Stmnt. ¶5]. Of these seven candidates, only Teresa Vachon was eligible for hire directly into the HRC position; the other six were eligible only for the LA position. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶19].

Three-person panels of managers within the Statewide Human Resources Division (including Anderson) conducted interviews of six of the seven

---

Urban (white), Aaron Glassman (white), Araceli Alvarez (Hispanic), Terri Vachon (white), Deborah Craig (white), Amisha Shah-Desai (Asian), Annette Ruchwa (white), Sonia Ruddock (black), and David Quadri (black). The applicants for the Leadership Apprentice Program (both qualified and unqualified) were Kelly Porter (white), Lisa Jaser (white), Rebecca Johnson (black), Daniel Curry (white), Paula Lohr (unknown), Suzanne Kaswan (white), Scott Nattinger (white), Judy Macala (white), Michael Cosgrove (white), Veronica Lee (black), John Neumon (white), Daniel Moreland (white), Juliette Khan (Hispanic), Mark Tendler (white), and Nayda Vega (Hispanic). [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶¶19,20; Dkt. 38-1, D's 56(a)1 Stmnt. ¶¶50, 51].

candidates,[4] each using an identical pre-set list of questions. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶28; Dkt. 38-1, D's 56(a)1 Stmnt. ¶7; Dkt. 38-5 (pp.59-60) (Exh. J), Anderson Aff. ¶7]. Libby did not participate in the interviews but was subsequently briefed by the managers as to each candidate's performance. [*Id.*]. Libby then briefed DAS Commissioner Linda Yelmini, who had taken no part in the hiring process for these positions either by reviewing applications, choosing which applicants to interview, or conducting the interviews, about the applicants who had been interviewed; Libby recommended that Curry, Cosgrove, and Moreland be hired as Leadership Apprentices pending a check of their references. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶29; Dkt. 38-1, D's 56(a)1 Stmnt. ¶8; Dkt. 38-6 (pp.1-2) (Exh. K), Yelmini Aff. ¶¶5,6]. Libby and Yelmini affirm that they discussed only the interviewees and did not discuss any applicant who had not been selected for an interview. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶29; Dkt. 38-6 (pp.1-2) (Exh. K), Yelmini Aff. ¶6]. Yelmini agreed with Libby's choice of Cosgrove, Moreland, and Curry. All three accepted Leadership Apprentice positions in late May 2006. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶10].

Neither Libby nor Anderson selected the Plaintiff, who is African American, for an interview. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶6]. Both attest that at no time did they discriminate against Johnson or any other candidate based on race or protected activity. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶31; Dkt. 38-5 (pp.59-60) (Exh. J), Anderson Aff. ¶8]. The Plaintiff received a letter dated May 16, 2006 informing her that she had not been selected for the position and explaining that

---

[4] Lisa Jaser cancelled her interview. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶28].

DAS had "extended offers to candidates whose qualifications more closely match[ed] [its] needs." [Dkt. 38-5 (p.19) (Exh. F), Non-selection Letter; Dkt. 38-1, D's 56(a)1 Stmnt. ¶6].

## Affirmative Action Goals

Plaintiff contends that she was qualified for the Leadership Apprentice Program but was not selected for an interview because of DAS's "undue reliance on hiring goals set forth in its then current, state approved, annual affirmative action plan," and that DAS instead awarded the position to Daniel Moreland, "an obviously unqualified Caucasian male." [Dkt. 32, Am. Compl. ¶¶9-12]. Under the state-approved affirmative action plan, DAS had affirmative action goals to hire white males for the HRC / LA positions for which Plaintiff applied.[5] [Dkt. 38-1, D's 56(a)1 Stmnt. ¶45; Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶31; Dkt. 38-6 (pp.11-13) (Exh. M), AA Report p.1]. In response to when an employer may take into account whether a candidate is a goal candidate under an affirmative action hiring plan, the Plaintiff has testified that, when deciding the finalists to interview after having eliminated unqualified candidates, "you take into consideration if any of them are goal candidates," and "if you have several candidates that are equally qualified, at some point, when you need to make eliminations, you should bring that factor

---

[5] Plaintiff states in her 56(a)2 Statement that she is unable to admit or deny this assertion and is "unwilling to concede" this assertion "since the Defendant has made conflicting claims to the CHRO regarding what the hiring goal was." [Dkt. 47, P's 56(a)2 Stmnt. ¶45]. The Plaintiff has cited to no evidence supporting her refusal to concede this point, and in fact has submitted no documentation from or relating to the CHRO that supports her assertion that DAS has made conflicting claims. The Plaintiff herself testified during deposition that she believed the goal candidate for the open positions to have been "white male." [Dkt. 38-3, P's Depo. p. 73:19-21].

into play . . . [a]nd give it some weight. . . Again, all things being equal, where you have candidates that are substantially equally qualified, you use that to tip the scales, so to speak."  [Dkt. 38-3, P's Depo. pp. 75:11-25; 76:14-25].

Libby offers the following affirmation in support of DAS's contention, on the other hand, that its hiring goals played no part in its choice of candidates:

> At no time during my review of the applications did I consider excluding any candidate based on race, gender, or any other protected trait or protected activity. I knew that, pursuant to the state-approved affirmative action plan, we had affirmative action goals to hire white males for these openings, but those goals did not determine who was interviewed or hired; I focused instead on finding the individuals – regardless of race or gender – who had the background and skills to best perform in the positions.

[Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶31; Dkt. 38-1, D's 56(a)1 Stmnt. ¶46].  In further support, Libby affirms that a few months before recruiting for the positions at issue in this case, DAS recruited and hired a Leadership Apprentice with a target class of HRC and, although the hiring goal for that position was also white male, DAS chose a black female for the position because she was the best candidate.  [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶32; Dkt. 38-1, D's 56(a)1 Stmnt. ¶48].

## Johnson's Application

Both the Plaintiff and Moreland applied specifically for the Leadership Apprentice Program.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶18; Dkt. 38-5 (pp.3-7) (Exh. C), Johnson Application; Dkt. 38-6 (pp.3-10) (Exh. L), Moreland Application].

Johnson submitted her application to DAS on April 5, 2006. [Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App.]. Her cover letter stated, in relevant part:

> Your review of my past professional experiences will illustrate that I am certainly a desirable candidate especially considering the level of training required for the position. I am quite capable of learning rapidly how to handle new complex responsibilities. My past professional experiences both as a litigator and H.R.O. Representative for the Commission on Human Rights and Responsibilities (sic)[6] have regularly provided me with exposure to a multitude of difficult tasks which I have executed in an excellent and efficient manner.
>
> I am also sensitive to handling the private, personnel related needs of employees in a highly professional, discreet and confidential manner. I am quite familiar with and enjoy studying and interpreting statutes, regulations and employment policies.

[*Id.* at p. 1; Dkt. 38-1, D's 56(a)1 Stmt. ¶19]. Plaintiff's resume indicates that she graduated from Oral Roberts University with a degree in History/Sociology, and graduated from Villanova University School of Law in 1993. [Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 2; Dkt. 38-1, D's 56(a)1 Stmt. ¶20].

Her resume further represents that Plaintiff was self-employed as an attorney for a total of nine years until January 2003 (although her resume states that she began this employment in January, 2004), during which time she "[p]rovided legal representation and litigation services to clients in a variety of areas including: civil rights, criminal, family and personal injury; Conducted trials

---

[6]  Johnson's cover letter contains an error, as she worked at the time for the Commission on Human Rights and Opportunities (the "CHRO"). [Dkt. 38-1, D's 56(a)1 Stmt. ¶19].

and handled appeals in state and federal court and administrative agencies," and reportedly earned between $60,000 and $80,000 annually. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶¶21, 22; Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 3]. Johnson did not fill in the box requesting that she report her "Reason for Leaving" this employment. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶23; Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 3].

Johnson's application reflects that in July 2004, months after ceasing her employment as a private attorney, she took a part-time job as a bank teller earning $15 per hour. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶22; Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 3]. She listed her duties in full as "[p]rocess[ing] financial transactions; respond[ing] to customer inquiries; sell[ing] banking products." [Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 3]. Plaintiff worked as a bank teller until December 2004, a period of six months (although Plaintiff's resume reports this period as seven months), when she took a position with the CHRO as an "H.R.O. Rep./Affirm. Action Prog. Analyst." [*Id.*; Dkt. 38-1, D's 56(a)1 Stmnt. ¶24]. Plaintiff reported that her duties included "[i]nvestigat[ing] charges of discrimination in employment, public accommodations settings; monitor[ing] affirmative action plans and practices of state agencies and private contractors doing business with state agencies." [Dkt. 38-1, D's 56(a)1 Stmnt. ¶25; Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 3]. Johnson had worked for the CHRO full time for sixteen months before applying for the position at issue in this case. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶24].

<u>Moreland's Application</u>

Like Johnson, Moreland applied specifically for the Leadership Apprentice program. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶18]. His cover letter indicates that at the time of application Mr. Moreland was an Executive Aide to Connecticut's Governor and although he had "immensely enjoyed his tenure of five years at the Office of the Governor," he felt it was "the right time to seek a new challenge and to further [his] educational and career development." [Dkt. 38-6 (pp.3-10) (Exh. L), Moreland App. p. 1]. Moreland's cover letter also explained how his job experiences had allowed him to "further develop[] leadership, customer service and professional skills." As the Governor's Proclamation and Official Statement writer, Moreland "was responsible for drafting all ceremonious correspondence utilizing both creative and business templates as well as conducting public affairs often giving remarks to a diverse number of organizations, non-profits and schools." [Dkt. 38-6 (pp.3-10) (Exh. L), Moreland App. p. 1; Dkt. 38-1, D's 56(a)1 Stmnt. ¶27]. He revamped the Governor's Internship program "creating and centralizing the application process, instituting an orientation program and individualizing each intern's experience with their career development goals," and additionally "facilitated an internship program for students with disabilities" which often led to employment placement. [*Id.*].

As an executive administrative support professional, Moreland noted in his cover letter that he interacted daily with state, federal, municipal, and corporate officials, had developed an in-depth knowledge of state government including its actors and programs and, as assistant to the Chief of Staff, was "directly responsible for the management of [the Governor's] office including

calendar/scheduling, information flow management, coordination of state travel request approval, staff support, execution of directives from both the Chief of Staff and Governor, and office budget matters including employee timesheets." [Dkt. 38-6 (pp.3-10) (Exh. L), Moreland App. p. 1].  In providing assistance to the Governor's Legislative Director, Moreland "track[ed] the Governor's proposed legislation, draft[ed] bill summaries, and interpret[ed] existing state statutes and regulations."  [*Id.* at p.1].  As an example of his leadership experience, Moreland described overseeing the development and logistics of the Hurricane Katrina Evacuee Relocation Plan, for which he served as the Governor's main point of contact, "led the Governor's Cabinet and community leaders in assessing state and volunteer resources" and also led two briefings for public officials and the general public.  [*Id.* at 2; Dkt. 38-1, D's 56(a)1 Stmnt. ¶27].

Moreland's very detailed resume lists four full-time positions spanning from May 1998 to the time of Moreland's application in April 2006, plus one part-time extra-curricular position and various volunteer and board memberships. [Dkt. 38-6 (pp.3-10) (Exh. L), Moreland App. pp. 4-5].  In addition to the tasks enumerated in his cover letter, Moreland elaborated that, as an Executive Assistant in 2000 with the Office of the Governor, he "served as statewide coordinator for the State of Connecticut's Annual Observance and Celebration of United Nations Day." [*Id.* at p. 4].  Moreland was then asked to fill a vacant position as an Executive Assistant in the Department of Public Works beginning in August 2003, where he served as Assistant to the First Lady [in the Rowland gubernatorial administration] and Executive Director of the Governor's residence

and was responsible for the coordination and scheduling of official duties and personal matters, assistance in the daily management and oversight of activities at the Governor's mansion, and assistance in the planning of various state conferences.  [*Id.*; Dkt. 38-1, D's 56(a)1 Stmnt. ¶27].  Moreland left this position in July 2004 upon the resignation of the Governor and assumed the title of Executive Assistant in the Office of the Governor where, in addition to the tasks detailed in his cover letter, Moreland worked on an initiative to assess and identify services to at risk youth.  [*Id.*].

Moreland also reported that he worked as a Customer Service Representative for Express I Airlines, d.b.a. Northwest Airlines before beginning his tenure with the State; had for the five years prior to his application served as a Customer Service Representative for the Bushnell Center for the Performing Arts; and had been a member of four municipal or state boards.  [Dkt. 38-6 (pp.3-10) (Exh. L), Moreland App. p. 5].  Finally, Moreland's resume states that he had been working toward his undergraduate degree from the University of Arkansas since 1993 and would graduate "pending completion of independent study," which his application indicates he was currently completing.  [*Id.* at 3; Dkt. 38-1, D's 56(a)1 Stmnt. ¶26].

### DAS's Purported Reasons for Hiring Decisions

The Department of Administrative Services prepared an "Affirmative Action Applicant Flow and Selection Report" ("AA Report") detailing the reasons for not interviewing various candidates and the dispositions of the six interviews conducted.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶28; Dkt. 38-6 (pp.11-13) (Exh. M), AA

Report].  Of the 26 applicants, two women – one white (Judy Macala) and one Hispanic (Nayda Vega) – were unable to meet the qualifications for the Leadership Apprentice Program and were thus disqualified from contention; Libby has affirmed that a third woman who did not report her race or ethnicity was similarly disqualified.  [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report p. 1; Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶20].  The twelve remaining candidates, qualified for only the Leadership Apprentice program, consisted of three white females, two black females (including the Plaintiff), one Hispanic female, and six white males.  [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶¶19-20; Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].  Four white males (Daniel Moreland, Mark Tendler, Daniel Curry, and Michael Cosgrove) and two white females (Lisa Jaser and Suzanne Kaswan) were chosen to interview for the LA program openings.[7]  [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].  One white female (Kelly Porter), two black females (the Plaintiff and Veronica Lee), one Hispanic female (Juliette Khan), and two white males (Scott Nattinger and John Neumon) were not chosen.  [*Id.*].

The AA Report states that the Plaintiff was not selected for an interview because "[c]andidate's prior work experience deemed unsuitable for position." [Dkt. 38-1, D's 56(a)1 Stmnt. ¶29; Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].  Dr. Libby explained her reasons for not choosing to interview the Plaintiff as follows:

> Ms. Johnson met the minimum qualifications for the
> Leadership Apprentice position.  However, it did not
> seem to me to be a good match to place an experienced
> attorney into the training level positions we were

---

[7]  The seventh interviewee, Theresa Vachon, was a white female eligible for hire directly as a Human Resources Consultant.

seeking to fill.  I felt that a lawyer, a highly trained
professional in a different field with no background in
human resources, would be unlikely to thrive or stay
long in a training position that involved performing
administrative support tasks, such as posting and
supporting the HR Certificate training program,
assisting in application review, and processing exams.
Since the long-term goal of hiring Leadership
Apprentices is to train people to fill future HRC
positions, it did not make sense to me to pursue
applicants that seemed likely to be bored or dissatisfied
with the level of the work to be performed.

[Dkt. 38-1, D's 56(a)1 Stmnt. ¶32; Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶24].

Libby noted that she "had similar concerns about Veronica Lee, the only
other attorney to apply for these positions," and thus did not select Ms. Lee for
an interview either.  [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶24; Dkt. 38-1, D's
56(a)1 Stmnt. ¶56].  The AA Report noted the reason for excluding Ms. Lee, who
was the only other black female applicant qualified for the LA program, and also
the only other lawyer, as "No HR, predominantly law."  [Dkt. 38-6 (pp.11-13) (Exh.
M), AA Report; Dkt. 38-1, D's 56(a)1 Stmnt. ¶56].  The AA Report noted "No HR,
trainer" as the reason that Juliette Khan, a Hispanic female, was not selected.
[Dkt. 38-1, D's 56(a)1 Stmnt. ¶53; Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].  Libby
explained that she did not consider Khan to be a good fit for the LA program
because "her background was as a trainer in emergency management issues, a
field not related to human resources management.  She had also worked as a
social worker and had a degree in psychology.  She did not have any work or
educational experience in human resources."  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶54].
Three white applicants were not selected to interview for similar reasons.  The AA

Report states that Kelly Porter, a white female, was not selected to interview for the LA position because "Degree & work experience finance-related." Scott Nattinger, a white male, was not selected because his "Overall qualifications deemed unsuitable for position, questionable work experience," and John Neumon, also a white male, was not selected because his "prior work experience deemed unsuitable for position." [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].

On the other hand, the AA Report noted of Daniel Moreland post-interview: "Five years experience at Governor's Office interacting with multiple state & municipal entities. Excellent communication skills. Proven ability to interpret state statutes & regulations. Very impressive references." [*Id.*]. Libby affirmed that she chose to interview Moreland

> [b]ecause his background made him a good fit for the Leadership Apprentice program. He had some experience with personnel management in the Office of the Governor – including revamping and coordinating the Governor's Internship Program, and facilitating internship programs for students with disabilities. Additionally, his experience coordinating large events for the Governor's Office, his legislative work, and the other duties he performed for the Governor demonstrated his attention to detail and organizational skills, his oral and written communication skills, and his ability to provide excellent customer service.

[Dkt. 38-1, D's 56(a)1 Stmnt. ¶31; Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶22d]. She further reported that Moreland's prior experience coordinating internship programs was an asset as DAS had contemplated establishing a statewide Cooperative Internship Program. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶28d].

Libby affirms that she chose to interview Michael Cosgrove, who received an offer of employment, because he had "personnel experience working with the State Office of the Comptroller in the retirement and benefits area, advising employees about their benefit entitlements and performing some payroll functions." He also demonstrated attention to detail and had "experience with the unique processes" used in Connecticut state human resources. Further, Libby noted that she felt his educational background in journalism and work experience as a reporter would be helpful in interviewing employees about their job duties and in writing clearly. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶22b]. Post-interview, the AA Report characterized Cosgrove as having "[p]rior State experience at State Comptroller in Human Resources-related field. Strong communication skills, especially writing skills. Has B.S. in Journalism & related employment history." [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].

Libby has stated that she selected Daniel Curry for an interview because he possessed a bachelor's degree in Human Resources Management and had worked as a Summer Worker for DAS in the Statewide Human Resources Management Division, which provided him with the background to be successful in the LA Program. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶22a]. Libby further affirmed that she knew that Curry "was reliable, had great computer skills, produced high quality work product, and worked efficiently." [*Id.*]. The AA Report notes similarly that Daniel Curry "[r]ecently received B.S. in Human Resources Management. Excellent reference from Department Chair at Western

N.E. College.  Prior experience working in agency Statewide Human Resources unit."  [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report].

<u>Johnson's Protected Activity</u>

In addition to her claim of race discrimination, Plaintiff has alleged that she was not considered for the DAS Leadership Apprentice opening in retaliation for her opposition to the CHRO's discriminatory practices.

On February 14, 2006, while working at the CHRO, the Plaintiff filed an initial complaint of discrimination with the federal Equal Employment Opportunity Commission ("EEOC"), and which was date-stamped as received by the EEOC's Philadelphia office on March 13, 2006.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶57; Dkt. 38-6 (pp.19-21) (Exh. P), P's EEOC Compl. 2/14/06].  Plaintiff brought this complaint against the State of Connecticut, the CHRO, CHRO Executive Director R. Hamisi Ingram, CHRO Deputy Assistant Executive Director Ray Pech, CHRO C.O.O. Don Newton, and CHRO Affirmative Action Manager Gloria Spavari, alleging that she and two coworkers, Valerie Kennedy and Paula Ross, had been suspended without pay in retaliation for opposing discriminatory practices within the CHRO, including discrimination perpetrated by Ingram.  [*Id.* at ¶58; Dkt. 38-6 (pp.19-21) (Exh. P), P's EEOC Compl. 2/14/06 ¶6.  Johnson alleged that during an internal investigation she had been a fact witness in support of her coworkers' complaints against Ingram, for which she had been disciplined.  [Dkt. 38-6 (pp.19-21) (Exh. P), P's EEOC Compl. 2/14/06 ¶7.  Plaintiff neither named DAS, DAS Commissioner Yelmini, Statewide Human Resources Management Director Libby, nor DAS Manager Anderson as a respondent in this initial complaint, nor did

Plaintiff mention any of them in her complaint as filed. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶59]. Moreover, Plaintiff does not claim or cite to any evidence in the record to show that the Defendant was aware of this EEOC Complaint.

On July 24, 2006, two months after Johnson had applied for and had not been selected for a Leadership Apprentice position with DAS, she filed an Amended Complaint Affidavit with the EEOC, adding allegations against DAS Commissioner Yelmini to those in her original complaint. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶60; Dkt. 38-6 (pp.22-32) (Exh. Q), P's Am. EEOC Compl. 7/24/06]. Johnson did not name Yelmini as a respondent, but rather listed her as one of "several other parties who are State employees, but are assigned to other divisions outside of CHRO who [Johnson] [has] recently learned were involved in facilitating CHRO's harassment and discriminatory and retaliatory conduct." [Dkt. 38-1, D's 56(a)1 Stmnt. ¶61; Dkt. 38-6 (pp.22-32) (Exh. Q), P's Am. EEOC Compl. 7/24/06 ¶5]. In support, Plaintiff attached to this Amended Complaint a letter from Yelmini to CHRO Executive Director Ingram dated February 14, 2006 and a letter from Ingram to Yelmini dated February 27, 2006 regarding the two complaints against Ingram by Johnson's CHRO coworkers Kennedy and Ross. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶62; Dkt. 38-6 (pp.33-36) (Exh. R), 2/14/06, 2/27/06 Ingram/Yelmini Correspondence].

Yelmini noted in this correspondence that a member of her staff had reviewed the CHRO internal investigation into the Ross and Kennedy complaints against Ingram and had determined that the investigations "appear to have been conducted in a professional manner" and in accordance with procedures. [Dkt.

38-6 (pp.33-36) (Exh. R), 2/14/06, 2/27/06 Ingram/Yelmini Correspondence p.1].

Yelmini noted that she had "also read the information and would agree." [*Id.*].

However, Yelmini expressed criticism of certain management practices regarding

the filing of employee grievances and admonished Ingram that employees have

the right to file grievances pursuant to their collective bargaining agreement, that

the grievance process was designed to resolve complaints, that it was important

to manage change in accordance with the collective bargaining agreement, and

finally that it is "also important to remember that no adverse action can result to

individuals based upon the exercise of their rights in a legitimate manner." [*Id.* at

1-2].

Commissioner Yelmini has affirmed that the hiring process for the three

open DAS positions was handled by DAS Human Resources and the DAS

Statewide Human Resources Management Division, and that she was not

involved in reviewing any applications, choosing which applicants to interview, or

in conducting the interviews. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶65; Dkt. 38-6 (pp.1-2)

(Exh. K), Yelmini Aff. ¶5]. After the interviews were completed, Yelmini attests

that Libby briefed her regarding the six applicants who had been interviewed and

recommended that DAS offer employment to Curry, Cosgrove, and Moreland.

She further attests that she and Libby had not discussed any applicants who had

not been selected for an interview. [Dkt. 38-1, D's 56(a)1 Stmnt. ¶66; Dkt. 38-6

(pp.1-2) (Exh. K), Yelmini Aff. ¶6]. Libby has also testified that she and Yelmini

did not discuss applicants who had not been interviewed. [Dkt. 38-5 (pp.52-58)

(Exh. I), Libby Aff. ¶29]. As a result, Yelmini states that she was not aware that

Johnson had applied for the LA position until after the hiring decision had been made and the offers had been extended.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶67; Dkt. 38-6 (pp.1-2) (Exh. K), Yelmini Aff. ¶7].  Three months after DAS hired other applicants and not the Plaintiff, Commissioner Yelmini signed the AA Report listing the names of all 26 applicants and interviewees in August 2006; she does not recall whether she noticed Johnson's name on the AA Report at the time she signed it.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶67; Dkt. 38-6 (pp.1-2) (Exh. K), Yelmini Aff. ¶8].

Yelmini has also attested that she cannot recall specifically when she became aware of Johnson's protected activity against the CHRO.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶63; Dkt. 38-6 (pp.1-2) (Exh. K), Yelmini Aff. ¶10].  Libby and Anderson, the DAS employees who had been responsible for reviewing applications and choosing interviewees, have attested that they were not aware of Plaintiff's involvement with complaints made against her then-employer the CHRO at the time they made their hiring decisions for the three open positions at issue here.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶64].

In October 2006, Johnson filed a separate complaint with the CHRO against the DAS alleging discriminatory and retaliatory failure to hire her for the LA position on or about May 26, 2006.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶68; Dkt. 38-5 (pp.20-25) (Exh. G), P's 10/6/06 CHRO Charge].  In this complaint Plaintiff stated as the basis for her retaliation claim her protected activity of filing her original complaint with the EEOC on February 14, 2006.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶69; Dkt. 38-5 (pp.20-25) (Exh. G), P's 10/6/06 CHRO Charge ¶4].  The record in the

case before this Court contains no further information about this complaint, including any determinations made or investigations conducted by the CHRO or by any federal agency.

IV.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to

back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

Further, when deciding whether summary judgment should be granted in a discrimination case, courts must take additional considerations into account. *Desir v. City of New York*, 453 F. App'x 30, 33 (2d Cir. 2011).

> A trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue. Affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination. Summary judgment remains appropriate in discrimination cases, as the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation.

*Id.* Thus, "[a]t summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). "A court is to examine the entire record to determine whether the plaintiff

could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Byrnie*, 243 F.3d at 102 (2d Cir. 2001) (citations omitted). "A motion for summary judgment may be defeated where "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 103 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).

V.    <u>Discussion</u>

Plaintiff's complaint focuses on the comparative credentials of Plaintiff and Daniel Moreland. Nowhere in her complaint does the Plaintiff make allegations against or even mention the other two applicants selected to fill the LA positions, Daniel Curry and Michael Cosgrove, who were also white males. Johnson has not alleged in her complaint that either Cosgrove or Curry was unqualified, or that she or any of the other minority applicants were more qualified than Curry or Cosgrove, and has only fleetingly mentioned Curry in her opposition to the Defendant's summary judgment motion, without any citation to evidence in the record. Further, although the Defendant has competently argued that Johnson's discrimination claim must be limited to a comparison of her application to only Moreland's, as specified in her amended complaint, Plaintiff has failed to respond at all to this argument as to scope. Therefore, as Plaintiff has not placed Curry's or Cosgrove's qualifications at issue and makes no reference to them in her operative complaint, and additionally has failed to address the Defendant's argument as to scope, the Defendant has appropriately limited its arguments to

**29**

Plaintiff's allegation against Moreland only. *See Karath v. Bd. of Trustees*, 3:07-CV-1073 (WWE), 2009 WL 4879553, at *3 (D. Conn. Dec. 10, 2009) (holding that plaintiff could not "amend his [Title VII] complaint by implication in response to summary judgment"); *Auguste v. Dep't of Corr.*, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment"); *Natale v. Town of Darien, Conn.*, CIV. 3:97CV583 (AHN), 1998 WL 91073, at *4 n.2 (D. Conn. Feb. 26, 1998) (holding that plaintiff cannot amend his complaint in a memorandum of law). The Court, however, consistent with its obligation to review the entirety of the record in discrimination cases at the summary judgment stage, will examine the record as a whole insofar as the record contains evidence as to Curry and Cosgrove.

Plaintiff's chief contention is that she was qualified for the HRC position through the Leadership Apprentice Program but was not selected for an interview, while DAS instead awarded the position to Moreland, "an obviously unqualified Caucasian male," based on its "undue reliance on hiring goals set forth in [DAS]'s then current, state approved, annual affirmative action plan." [Dkt. 32, Am. Compl. ¶¶9-12]. She further alleges that eight other minority applicants were better qualified for this position than was Moreland, and that, in addition to unlawful discrimination based on race, DAS also declined to hire her in retaliation for Johnson having previously opposed the CHRO's unlawful discriminatory conduct. [Dkt. 32, Am. Compl. ¶¶11, 21].

The Defendant urges the Court to grant summary judgment in its favor because Johnson has failed to establish a prima facie case of racial discrimination and, even if she has, she has presented no evidence that DAS's proffered legitimate, nondiscriminatory reasons for declining to hire the Plaintiff were a pretext for discrimination.  DAS further contends that Johnson cannot establish a prima facie case of retaliation.  The Court addresses Defendant's arguments in turn.

      a. <u>Title VII Racial Discrimination</u>

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire any individual … because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Johnson's Title VII racial discrimination claim is governed by the three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Ruszkowski v. Kaleida Health Sys.*, 422 F. App'x 58, 60 (2d Cir. 2011).  Under this framework, a plaintiff complaining of discriminatory failure to hire must establish by a preponderance of the evidence that (1) she is a member of a protected class; (2) she was qualified for the position for which she applied; (3) she was denied the position; and (4) the denial occurred under circumstances giving rise to an inference of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *Ruszkowski*, 422 F. App'x at 60; *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  The burden upon the plaintiff to prove a prima facie case is minimal. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).  *See also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have

characterized plaintiff's prima facie burden as 'minimal' and 'de minimis.'").
However, "[a] plaintiff cannot establish a prima facie case based on 'purely
conclusory allegations of discrimination, absent any concrete particulars.'"
*Ruszkowski*, 422 F. App'x at 60 (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.
1985)).

If a plaintiff successfully alleges a prima facie case of discrimination, the
burden of production shifts to the employer to demonstrate a legitimate, non-
discriminatory reason for its decision not to hire the plaintiff. *McDonnell
Douglas*, 411 U.S. at 802; *Ruszkowski*, 422 F. App'x at 60. If the employer
articulates such a reason, the burden then shifts back to the plaintiff to present
"admissible evidence that would be sufficient to permit a rational finder of fact to
infer that the employer's proffered reason is pretext for an impermissible
motivation." *Vivenzio*, 611 F.3d at 106 (citation omitted); *Texas Dep't of Cmty.
Affairs v. Burdine*, 450 U.S. 248 (1981) ("To accomplish this, the defendant must
clearly set forth, through the introduction of admissible evidence, the reasons for
the plaintiff's rejection."). "[A] reason cannot be proved to be a pretext *for
discrimination* unless it is shown *both* that the reason was false, *and* that
discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,
515 (1993) (emphasis in original). Throughout the burden-shifting process, "[t]he
ultimate burden of persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the plaintiff."
*Vivenzio*, 611 F.3d at 106 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

Furthermore, although Plaintiff's complaint alleges that DAS has engaged in "discriminatory use of affirmative action goal setting," evidencing a "pattern and practice that adversely impacts African American employees," [Dkt. 32 Compl. ¶22], and has "consistently shown a pattern and practice of engaging in acts of retaliation against employees," [*Id.* at ¶23], the Defendant correctly notes that Johnson may not avail herself of the more permissive pattern-or-practice method of proving discrimination articulated in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). "[U]nlike in a typical individual disparate treatment suit, a plaintiff's burden under the pattern-or-practice method requires the plaintiff to prove only the existence of a discriminatory policy rather than all elements of a prima facie case of discrimination—but under the pattern-or-practice method, only prospective relief [is] available, unless the plaintiffs offer [ ] additional proof." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 149 (2d Cir. 2012) cert. denied, 133 S. Ct. 1724, (2013) (citation and internal quotation marks omitted). The Second Circuit has recently held that, while "[e]vidence of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment or to a disparate impact claim," "[o]utside the class context, however, private plaintiffs may not invoke the *Teamsters* method of proof as an independent and distinct method of establishing liability." *Id.* at 150. This case is not a class action. Thus, while Johnson may offer evidence of Defendant's pattern or practice of discrimination to aid her individual disparate treatment claim, "the pattern-or-practice method of proof is not available to

nonclass, private plaintiffs" like Johnson, who instead remain subject to the *McDonnell-Douglas* burden shifting standard articulated above. *Id.*

### i. Plaintiff's Prima Facie Case of Discrimination

Defendant DAS concedes that Johnson has satisfied the first three elements of her prima facie case of racial discrimination, as Plaintiff is a member of a protected class, was qualified for the Leadership Apprentice position for which she applied, and was denied the position. DAS argues that Johnson's discrimination claim must fail because she cannot satisfy the fourth element of her prima facie case: that the decision to hire Daniel Moreland instead of her was made under circumstances giving rise to a pretext of discrimination. The Court will analyze Defendant's arguments in turn.

Plaintiff's allegations of discrimination are based primarily on her belief that Daniel Moreland, to whom DAS awarded the LA position, was "obviously unqualified" "as he held no college degree and lacked the necessary qualifying professional experiences which the Defendant apparently required for consideration for hire," while the Plaintiff possessed both bachelor's and master's degrees. [Dkt. 32, Compl. ¶¶9, 10, 11]. The Plaintiff testified at deposition that it was her understanding, "based on conversations that [she] had with people that worked for DAS," that a college degree was required for the HRC position. [Dkt. 38-3, P's Depo. p. 32:21-25]. Plaintiff does not identify the DAS employees who made the statements, does not state the context in which the statements were made, and has not submitted affidavits from these individuals. Such statements are inadmissible hearsay as they are non-testimonial assertions

of fact offered by the Plaintiff to establish that the assertion is true. Fed. R. Evid. 801(c). These alleged statements are not a statement of an opposing party falling outside the definition of hearsay because Plaintiff has not disclosed any information about the declarant and the context in which the statement(s) were made to fall within that category. Fed. R. Rule. Evid. 801(d)(2). Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment. *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009). *See Bell v. Rochester Gas & Elec. Corp.*, 329 F. App'x 304 (2d Cir. 2009) (exclusion of racially offensive e-mail offered by former employee to show pretext in opposing summary judgment on Title VII discriminatory discharge claim was not abuse of discretion, given lack of evidence authenticating e-mail, such as showing that e-mail was sent or received through former employer's e-mail system); *Fall v. New York State United Teachers*, 289 F. App'x 419 (2d Cir. 2008) (unsworn audiologist reports offered by terminated employee in ADA action were inadmissible hearsay evidence for purposes of opposing motion for summary judgment); *Dingle v. Zon*, 189 F. App'x 8 (2d Cir. 2006) (summary judgment affidavit was not inadmissible on hearsay grounds, where affidavit contained a statement about events that the affiant witnessed). This Court will not exercise its discretion to admit these attributed statements as their credibility are undermined by admissible evidence in the record.

Neither the Job Announcement nor the Leadership Apprentice or Human Resources Consultant positions states a requirement of a college or advanced degree, and instead specifically contemplates the substitution of post-high

school education for the professional experience required for the job.  The LA Program required a successful applicant to "be able to meet the experience and training requirements of the [HRC] target class within the three year training period" of the LA program.  To qualify as a Human Resources Consultant at the junior working level, an applicant was required to have "[s]ix (6) years of professional experience in classification, compensation, job evaluation, recruitment, examination, selection or closely related areas in the field of human resources management," but could substitute up to four years of college credit for this six year requirement, and an additional year if the candidate possessed a Master's degree in public administration, human resources management, or another closely related field.

Johnson herself acknowledged at deposition that she could identify nothing in the HRC job description stating that a college degree was required for consideration.  [Dkt. 38-3, P's Depo. p. 32:2-14].  She further acknowledged that she could not remember who at DAS advised her that a college degree was necessary for the LA position, or what that person's title was within DAS.  [Dkt. 38-3 [or 38-4], P's Depo. pp. 33:22-24; 34:14-25; 41:8-14].  Rather, Johnson stated that the "thrust" of her inquiry to the DAS "was what does being a leadership apprentice mean, what's involved in the training program," as this was "more of [her] concern" and "[t]he whole college degree thing was assumed that it was necessary."[8]  [Dkt. 38-3, P's Depo. p. 39:6-15].  Thus, even if the requirements in

---

[8] Plaintiff's testimony also reveals the following back and forth:

the HRC and LA job descriptions are not controlling (and Plaintiff has presented no evidence that they are not), Plaintiff's own recollection of the details provided to her does not comport with her allegations that a college degree was necessary for entry into the LA Program.

Further, a review of the record indicates that Moreland was in fact qualified for the Leadership Apprentice position. Moreland's resume reflects that receipt of his college degree was pendant upon completion of independent study. Thus, upon completion of his degree, Moreland would have been eligible to substitute four years of college credit for the six years of experience required for the HRC position. In conjunction with two years of training in the LA Program, Moreland could thus have become eligible for entry into the HRC position at the junior working level within three years of entering the LA position, even without considering Moreland's prior work experience. Indeed, even if Moreland could not complete his degree within the three year training period for the LA position, he would still have been eligible to substitute at least three years of college credits for the six year experience requirement, thus allowing him to meet the six total year requirement. Given that neither job description required a college degree and that Mr. Moreland was qualified for the LA position, Moreland's lack of college degree upon application for the LA position does not in itself create an inference of discrimination.

---

Q:      So your answer is "no," you did not evaluate these [HRC and LA job descriptions], to see if there was a minimum educational requirement? You just assumed there was?
A:      I just assumed, yes.
[Dkt. 38-3, P's Depo. p. 40:16-19].

Moreover, the record does not reflect that Moreland "lacked the necessary qualifying professional experiences" for entry into the LA Program.  Minimum qualifications for the LA position were listed as

> Considerable managerial aptitude; considerable oral and written communication skills; interpersonal skills; considerable ability to understand and apply state and federal laws, statutes and regulations; considerable ability to analyze and solve problems; considerable ability to effect and manage change; considerable ability to plan for an implement excellent customer service; considerable ability to learn a new knowledge base; considerable ability to learn and apply policy and procedure.

[Dkt. 38-5 (pp.15-18) (Exh. E), LA Job Desc. p. 1].  Moreland's application demonstrates that Moreland acted as the Governor's Proclamation and Official Statement writer responsible for drafting all ceremonious correspondence, for which he used both business and creative templates, and for giving public remarks to various organizations, a position which may evidence Moreland's oral and written communication skills.  His daily interaction with state, federal, municipal, and corporate officials while at the Governor's Office speaks to his interpersonal and customer service skills and, at the least, his coordination and implementation of the Hurricane Katrina Evacuee Relocation Plan and several internship programs as well as his position as assistant to the Chief of Staff evidence his managerial aptitude, his ability to effect and manage change, his ability to learn and apply policy and procedure, and his ability to analyze and solve problems.  Moreland also reported that he "track[ed] the Governor's proposed legislation, draft[ed] bill summaries, and interpret[ed] existing state

statutes and regulations," thus demonstrating his ability to understand and apply state and federal laws, statutes and regulations. In short, even the abridged portion of Moreland's resume the Court has highlighted provides more than ample evidence that Moreland met the minimum qualifications for the LA position. Plaintiff's conclusory contention that Moreland was not minimally qualified for the LA position does not support an inference of discrimination.

Nor does the record support Plaintiff's argument that a "special condition was created that allowed [Moreland] to be hired on the condition that he complete his degree program before his probationary term was completed." [*See* Dkt. 45, P's Opp. to MSJ pp. 12-13]. Notwithstanding that Plaintiff has presented no evidence in the record that a college degree was required for either the LA or HRC position, Plaintiff has also failed to demonstrate that DAS created any sort of special condition for Moreland to finish his post-high school education. In addition to presenting no admissible evidence to support this claim, Johnson alleged during deposition that "there were notations on Mr. Moreland's application that indicate that he had to finish his degree, and special considerations were being given to him, so that he could finish his degree before he would be promoted to the . . . [HRC] position." [Dkt. 38-3, P's Depo. p. 56:12-20]. The record does not support Plaintiff's contention. Both parties have submitted copies of Daniel Moreland's application on the record, neither of which contains any notations. [*See* Dkt. 38-6 (pp.3-10) (D's Exh. L); Dkt. 46-3 (pp.16-23) (P's Exh.)].

Plaintiff further argues that this alleged special consideration was not extended to the "only two minority candidates who had not completed their bachelor's degree programs" and who were "eliminated specifically for not having a bachelor's degree according to the AA Report:" Judy Macala and Nayda Vega. [Dkt. 45, P's Opp. to MSJ p. 12]. DAS deemed Ms. Macala, who is white, and Ms. Vega, who is Hispanic, to be unqualified for the LA position because they had "no degree to qualify for Lead. Apprent." [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report pp. 1, 2]. Plaintiff misinterprets this notation as providing evidence that a college degree was required for the LA position. As previously noted, no evidence in the record supports Plaintiff's contention that a college degree was required for consideration into the LA Program; however, the completion of college credits could be substituted for the experience necessary to qualify. While Moreland possessed at least three years of college credits that he could substitute for three (or more) years of experience, Macala and Vega could not demonstrate sufficient combined college credit or experience to make up the three years required to qualify for the LA Program, exclusive of the three years of training the Program itself would provide.

Judy Macala's application reveals that she served as both a Payroll Associate and a Financial Associate for the Department of Corrections for approximately six years, neither of which falls into the categories of professional experience necessary to meet the six year experience requirement: classification, compensation, job evaluation, recruitment, examination, selection or closely related areas in the field of human resources management. [Dkt. 46-2, (pp.8-15)

Macala App. p.9].  Although Macala's application notes that she completed two years of community college, without one year of qualifying professional experience, Macala could not make up the three total years of educational and experiential requirements for admission to a three year LA program.  Additionally, Macala's non-selection despite that she was Caucasian, the same race as Daniel Moreland, would tend to negate Plaintiff's contention that DAS's application of any college degree requirement was applied discriminatorily to disqualify racial minority applicants.

Similarly, Nayda Vega's application for a Leadership Apprentice position demonstrates that she could not meet the position's requirements.  Her application reflects that she had neither completed any college credits nor was working toward a degree.  [Dkt. 46-2 (pp.16-22) Vega App. pp.17, 22].  Further, much like Ms. Macala, Vega had worked as both a Payroll Clerk and a Financial Clerk for the Department of Corrections for several years, neither of which – as in Macala's case – falls into the categories of professional experience necessary to meet the six year experience requirement.  [*Id*. at 16, 18].  Ms. Vega also listed more than fifteen years of experience as a Human Resources Representative in the private sector, but during which time she appears to have performed tasks unrelated to classification, compensation, job evaluation, recruitment, examination, selection or closely related areas in the field of human resources management; Vega listed duties including advising employees on pay plans and pay increases, assisting employees with benefits, conducting monthly audits on time and attendance, reviewing resumes, assisting in "procedures for hiring,

promoting and terminating employees," and performing a number of administrative and/or customer service related tasks. [*Id*. at 18]. Thus, without any college credit to offset her lack of experience in human resources management as listed in the HRC job classification (and without any evidence to the contrary proffered by the Plaintiff), Ms. Vega was unable to meet the three year requirement for hire as a Leadership Apprentice. Because neither Macala nor Vega were qualified for the LA position, their non-selection does not raise an inference of discrimination which may support Plaintiff's prima facie case.

Johnson also argues that neither she nor eight other racial minorities – most of whom had earned advanced degrees – were selected to interview for the DAS openings, and that a "paper review" provides sufficient information to "demonstrate that the Defendant's selection process was racially tinged and motivated," thus demonstrating the inference of discrimination necessary for her prima facie case. [Dkt. 45, P's Opp. to MSJ p. 11]. Further, Johnson contends that the Defendant cited contradictory reasons for the elimination of each of these minority candidates, thus supporting her claim that she was eliminated on the basis of her race. [*Id*.]. A review of the record shows that Plaintiff's argument is largely flawed.

First, as the Defendant correctly notes, six of Plaintiff's eight purported comparators are not similarly situated to Johnson or to Moreland, an assertion that Johnson does not dispute and has not addressed. "When considering whether a [Title VII] plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must

show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted).  "Whether two employees are similarly situated ordinarily presents a question of fact for the jury."  *Id.* at 39.  However, "where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  *See also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir.2001) ("This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

This action is not a class action, and thus Johnson may not bring claims of disparate treatment on behalf of the eight individuals she seeks to compare to Moreland.  Even if this case were a class action in which Johnson could assert claims on behalf of these eight, six of the eight are inappropriate comparators for Moreland.  The eight individuals Plaintiff seeks to compare to Moreland are Louis Daevis (black), Sonia Ruddock (black), Amisha Shah-Desai (Asian), Veronica Lee (black), David Quadri (black), Araceli Alvarez (Hispanic), Nayda Vega (Hispanic), and Juliette Khan (Hispanic).  [Dkt. 38-5 (pp.26-51) (Exh. H), P's Interrogatory Responses, #7].  Johnson alleges that none of the eight was interviewed or hired despite possessing "the educational and professional experiential background that Daniel Moreland lacked," and that all eight were denied consideration due to

their race and color.  [*Id.*].  As explained prior, Nayda Vega applied but was not qualified for the Leadership Apprentice position and thus was not similarly situated to Moreland or to the Plaintiff, who both possessed the minimum credentials for the position.  Five of the remaining seven applicants – Daevis, Ruddock, Shah-Desai, Quadri, and Alvarez – were qualified for direct appointment into and applied for the higher level HRC position, for which neither Moreland nor Johnson was qualified and for which neither applied.  [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶19].  The Plaintiff does not dispute that these six applicants were *not* similarly situated to Moreland or to the other interviewees or successful applicants for the LA position.  Thus, six of the eight applicants to whom Plaintiff cites provide no support in proving her prima facie case, as none are appropriate comparators for Moreland or the other LA applicants and no inference of racial discrimination may appropriately be drawn from their non-selection. Accordingly, the only two comparators of the above eight who are appropriate and relevant to Plaintiff's prima facie case are Veronica Lee and Juliette Khan, both of whom were qualified applicants for the Leadership Apprentice Program, and neither of whom was selected for an interview.

Moreover, if Plaintiff intends to assert that the non-selection of these five minority HRC candidates demonstrates a pattern or practice within DAS of failing to hire minority candidates (notwithstanding that they are inappropriate comparators for Moreland), their non-selection still fails to raise an inference of discrimination.  The record demonstrates that, of the eleven total applicants for the HRC position, five white males and females were similarly not chosen to be

interviewed, and the only applicant for the HRC position to be interviewed – Theresa Vachon – was a white female who ultimately was not selected to fill an open position. This demonstrates little more than DAS's failure to hire *any* candidates for the HRC position.

Nor are the applications of Juliette Khan or Veronica Lee – the two other qualified minority applicants for the LA position – so clearly superior to those of the successful candidates that they support an inference of discrimination as to Johnson's application by demonstrating a pattern or practice within DAS of not interviewing qualified minority candidates. Veronica Lee was not selected for a position, according to the AA Report, because she had no human resources experience and because her experience was "predominately law." [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report p.2]. Libby stated that her concerns as to Johnson's professional training as a lawyer were also applicable to Ms. Lee, the only other attorney to apply for the position. Lee's resume states that she worked for the CHRO as an Intake Officer in the Housing Discrimination Unit, had experience as an associate attorney in the Commercial Real Estate Department of a local firm, and had become a Senior Attorney for a large private corporation where she managed dispute resolution in various commercial legal areas. [Dkt. 46-2 (pp.23-26) Lee App. p.2]. Lee's cover letter states: "[t]he position posted is a good match for my skills and interests. I believe my legal skills and life experience fit nicely with the job requirements, and I am certain I could make a significant contribution to DAS." [Dkt. 46-2 (pp.23-26) Lee App. p.1]. Her cover letter does not explain how she believed the position to be a good fit for her skills

or interests, or how her skills and interests dovetailed with the job requirements. While Lee was certainly qualified for the LA position, the Court cannot conclude that she was vastly more qualified than Moreland such that a reasonable inference can be drawn that a pattern or practice of discrimination existed within DAS.

The AA Report states that Juliette Khan was not chosen for a Leadership Apprentice position because she had no human resources experience and was instead a "trainer." [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report p.2]. Khan possessed a bachelor's degree in psychology and had been employed as a Training Program Specialist at the Connecticut Office of Emergency Management for nearly ten years, where she was responsible for developing, planning, budgeting and implementing emergency management training programs. [*Id.*]. For seven years prior, Khan had worked as a Trainer in the same agency where she prepared and conducted training courses. [*Id.*]. Prior to that Khan was a social worker for the Department of Children and Families. [*Id.*]. Like Johnson, Lee, and Moreland, Khan was well-qualified for the LA position. Like Johnson and Lee, though, she was not such a clear choice over Moreland so as to provide a clear inference that a pattern or practice of discrimination existed at DAS.

Plaintiff also contends that the DAS hired Moreland instead of her "by placing undue reliance on hiring goals set forth in its then current, state-approved, annual affirmative action plan . . . [which] had set a hiring goal to hire a number of qualified Caucasian males" for the HRC or LA positions. [Dkt. 32, Am. Compl. ¶12]. Under the state-approved affirmative action plan, the hiring goal for

these positions was white male.  Libby has averred she knew of this hiring goal but that at no time during her review of the applications did she consider excluding any candidate based on race, gender, or any other protected trait or activity.  Plaintiff has presented no competent evidence that Moreland's hire resulted from the *application* of the affirmative action goals or the *misapplication* of the goals; nor does she challenge the legality of the goal.  She has also presented no evidence as to what would constitute correct application of the affirmative action goals.

Furthermore, even if DAS applied the affirmative action goal to hire white males for the LA position, Plaintiff has presented no evidence that this application would constitute a *misapplication*.  Indeed, Johnson specifically testified that the State could consider in a hiring decision whether an applicant was a goal candidate: "if you have several candidates that are equally qualified, at some point, when you need to make eliminations, you should bring that factor into play. . . . And give it some weight."  [Dkt. 38-3, P's Depo. p. 76:14-18].  "[A]ll things being equal, where you have candidates that are substantially equally qualified, you use that to tip the scales, so to speak."  [*Id.* at p. 76:23-25].  In her own position with the CHRO reviewing affirmative action plans, the Plaintiff averred: "I would look at the pool of qualified candidates, and as I'm eliminating people I would make sure that if I'm eliminating a goal candidate, I take a second look, a little additional scrutiny – this person is a goal candidate, they are minimally qualified, is it really the right thing to do to eliminate them, and really ask myself again why I am eliminating them."  [*Id.* at p. 78:12-18].  Plaintiff's

argument that she was much more qualified than Daniel Moreland is based on her misbelief that a college degree was required for the job.  Because it was not, she and Moreland were equally qualified, as the Court will discuss later in greater detail.  Thus, even by Plaintiff's own admission, the DAS was entitled to bring into play the fact that an applicant was a goal candidate.  Regardless, Plaintiff points to no evidence to suggest that the DAS chose Moreland over her because Moreland was a goal candidate.

DAS further argues that the DAS's hiring in April 2006 of a black female for a Leadership Apprentice position with the target class of HRC in spite of the hiring goal being white male suggests that DAS's affirmative action goals were not being misapplied to require the hiring of unqualified, white goal candidates.  Libby affirmed that "only a few months before we recruited for the three Leadership Apprentice positions at issue here, we recruited and hired another Leadership Apprentice with a target class of HRC . . .  Although we had an affirmative action goal to hire a white male for this opening, we chose a black female to fill this vacancy because she was the best candidate.  The individual that we chose, Francine Dew, began working in the Statewide Human Resources unit at DAS on April 7, 2006."  [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶32].  Plaintiff has not addressed this argument.  The Court agrees that no competent evidence exists in the record to support an inference of discrimination based on any misapplication of the DAS's affirmative action hiring goals, and which notion is undercut by the Plaintiff's own testimony and the hiring of a non-goal, minority candidate shortly before Johnson applied for the same position.

Lastly, the Court notes that both the Plaintiff and Defendant have made arguments irrelevant to the inference of discrimination analysis.  DAS argues that Johnson's experience as an attorney is suspect due to various suspensions of her license to practice law, and these suspensions account for Plaintiff failing to report on her application her reason for ceasing self-employment as an attorney. [Dkt. 40, D's MSJ pp. 10, 28].  However, DAS has pointed to no evidence in the record suggesting that anyone at DAS was aware of any suspensions of Johnson's law license at the time DAS reviewed the LA applications or made hiring offers to Curry, Cosgrove, and Moreland.  Johnson, in turn, argues that Moreland was terminated from employment with the State of Connecticut Ethics Commission in 2006 because he lied on his application for that position. Johnson has proffered no evidence to support this claim or to demonstrate that DAS knew of any transgression by Moreland.  The Plaintiff also refers extensively in her statement of facts in her opposition motion to the administrative investigation conducted by the Connecticut Commission on Human Rights and Opportunities' into her discrimination complaint.  Despite repeated references to the CHRO's findings, the Plaintiff has not attached a single exhibit relating to the CHRO's investigation or findings.  The findings of the CHRO on the ultimate issue in dispute is of dubious reliability as Plaintiff has not filed the underlying evidence substantiating the finding in opposition to the motion for summary judgment, nor have the Defendants.  Fed. R. Evid. 803(8)(c).  *See Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60 (2d Cir. 1998) (holding that the fact that evidence falls within an exception to the hearsay rule does not necessitate its admissibility,

and noting that the court has a duty to determine its credibility, probity and usefulness to the jury which cannot be ascertained absent the record of the administrative proceeding).  Because no evidence in the record supports any of the foregoing arguments or factual assertions, the Court disregards them in its analysis.

Despite the weight of Defendant's well-reasoned arguments as discussed above, the record nonetheless reflects that of the twelve qualified[9] applicants for the Leadership Apprentice program, nine were white and three were either black or Hispanic; the six candidates chosen to interview were white; four of the six were male; and the three candidates offered the positions were white and male. The Plaintiff has thus arguably – and very slimly – met her *de minimus* burden of establishing a prima facie case of discrimination.  *See James v. New York Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000) ("At the outset, a plaintiff can avoid dismissal by presenting the 'minimal' prima facie case defined by the Supreme Court in *McDonnell Douglas*.  This requires no evidence of discrimination.  It is satisfied by a showing of 'membership in a protected class, qualification for the position, an adverse employment action,' and preference for a person not of the protected class.") (citations omitted); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (citing *James*, 233 F.3d 149, and noting same).  *See Lomotey v. Connecticut Dep't of Transp.*, 3:09CV2143 VLB, 2012 WL 642763, at *14 (D. Conn. Feb. 28, 2012) (de minimis burden under fourth prong met where white applicants were selected for most of the positions for which minority plaintiff

---

[9]    As noted previously, Paula Lohr (unknown race), Judy Macala (white), and Nayda Vega (Hispanic) were not qualified for the LA position.

applied); ***Pippin v. Town of Vernon***, 660 F. Supp. 2d 354, 364 (D. Conn. 2009) (JBA) (fourth element of prima facie case established where female applicant "was qualified for the position for which a man was hired").

> ### ii. Defendant's Proffered Nondiscriminatory Reason for Non-Selection

Regardless of whether Johnson has – or has not – established a prima facie case of discriminatory failure to hire based upon her race, DAS has offered several legitimate, nondiscriminatory reasons for not hiring Johnson, thus negating her prima facie case and shifting the onus of production back to the Plaintiff. In meeting its burden of articulating a nondiscriminatory reason for taking an adverse employment action, "an 'employer's explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'" ***Byrnie v. Town of Cromwell, Bd. of Educ.***, 243 F.3d 93, 105 (2d Cir. 2001) (quoting ***Meiri v. Dacon***, 759 F.2d 989, 996-97 (2d Cir. 1985)). *See also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ("the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."). However, "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case. The defendant need not persuade the court that it was actually motivated by the proffered reasons." ***Paul v. Bank of Am.***, CIV 3:08CV1066JBA, 2010 WL 419405 (D. Conn. Jan. 29, 2010) (quoting ***Fisher v. Vassar Coll.***, 114 F.3d 1332, 1335–36 (2d Cir. 1997)); *see also Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) ("The defendant is not required to prove that the articulated reason actually motivated its actions.").

DAS contends that it chose to hire for the LA position because it intended to rotate Leadership Apprentices through the various units at Statewide Human Resources so that they could be cross-trained in anticipation of the need to fill open HRC positions as employees retired in the coming years, and further because LAs were less expensive to hire and could perform various administrative support tasks. DAS contends that, after reviewing the applications, it concluded that it would not be a good match to place an experienced attorney into the training Leadership Apprentice position, particularly because some of the position's duties were administrative, which would not incentivize applicants like Johnson to stay long in the position. In the rejection letter that the DAS sent to Johnson on May 16, 2006, DAS informed her that it had "extended offers to candidates whose qualifications more closely match[ed] [its] needs." [Dkt. 38-5 (p.19) (Exh. F), Non-selection Letter; Dkt. 38-1, D's 56(a)1 Stmnt. ¶6]. The Affirmative Action Report noted that Johnson was not selected for an interview because the "[c]andidate's prior work experience deemed unsuitable for position." [Dkt. 38-1, D's 56(a)1 Stmnt. ¶29; Dkt. 38-6 (pp.11-13) (Exh. M), AA Report]. Dr. Libby, who reviewed the applications and chose the interview candidates, further explained that "it did not seem to [her] to be a good match to place an experienced attorney into the training level positions [DAS was] seeking to fill." [Dkt. 38-1, D's 56(a)1 Stmnt. ¶32; Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶24]. Libby felt that a lawyer, "a highly trained professional in a different field with no background in human resources, would be unlikely to thrive or stay long in a training position that involved performing administrative

support tasks, such as posting and supporting the HR Certificate training program, assisting in application review, and processing exams." [*Id.*]. Because the long-term goal of hiring Leadership Apprentices was to train people to fill future HRC positions, Libby reported that it did not make sense to her to pursue applicants that seemed likely to be bored or dissatisfied with the level of the work to be performed. [*Id.*].

DAS has thus satisfied its burden of production under *McDonnell-Douglas* by articulating several legitimate, nondiscriminatory reasons for Plaintiff's non-selection.

### iii. <u>Lack of Pretext</u>

Given that the Defendant has articulated legitimate, nondiscriminatory reasons for Johnson's non-selection, the burden shifts back to the Plaintiff to present "admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation." *Vivenzio*, 611 F.3d at 106 (citation omitted). "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original). The Plaintiff may meet her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Cooper v. Connecticut Pub. Defender's Office*, 480 F. Supp. 2d 536, 545 (D. Conn. 2007) aff'd sub nom. *Cooper v. State of Connecticut Pub. Defenders Office*, 280 F. App'x 24 (2d Cir. 2008)

(quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256). Accordingly, conclusory and substantially unsupported assertions that an employer's proffered race-neutral reason was a pretext for discrimination may support a grant of summary judgment in favor of the employer. *See, e.g., Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) ("if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate"). A prima facie case coupled with "sufficient evidence to reject the employer's explanation may permit a finding of liability." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The Supreme Court has observed, though, that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," as in cases where the record conclusively reveals some other, nondiscriminatory reason for an employer's decision. *Id.* at 148.

A plaintiff seeking to prove that a discrepancy in qualifications supports an inference of pretext faces a formidable burden. The Second Circuit has articulated that

> [w]hen a plaintiff seeks to prevent summary judgment
> on the strength of a discrepancy in qualifications
> ignored by an employer, that discrepancy must bear the
> entire burden of allowing a reasonable trier of fact to not
> only conclude the employer's explanation was
> pretextual, but that the pretext served to mask unlawful
> discrimination. In effect, the plaintiff's credentials would
> have to be so superior to the credentials of the person

> selected for the job that no reasonable person, in the
> exercise of impartial judgment, could have chosen the
> candidate selected over the plaintiff for the job in
> question.

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001); *Barry v. New Britain Bd. of Educ.*, 300 F. App'x 113, 114 (2d Cir. 2008) (paraphrasing same). "The law is well-established that federal courts hearing discrimination claims do not 'sit as a super-personnel department' to reexamine a firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions." *Newsom-Lang v. Warren Int'l, Inc.*, 80 F. App'x 124, 126 (2d Cir. 2003) (citing *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir.1997)). An employer accordingly "has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 259; *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 16 (2d Cir. 2009) (quoting same; affirming dismissal of failure to promote claim). Thus, "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision," but "[a] t the same time, the court must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie*, 243 F.3d at 103 (citations omitted).

Here, Johnson does not address Defendant's argument that she cannot prove pretext, but has instead argued only that she has successfully made out a prima facie case of race discrimination. She asserts in support of her prima facie case, though, that "[t]here is more than sufficient evidence, just based on a paper review, to demonstrate that the Defendant's selection process was racially tinged and motivated." [Dkt. 45, P's Opp. to MSJ p.11]. Johnson's argument in support focuses on her belief that she and the other minority applicants were better qualified for the positions than were Moreland or Curry and that DAS presented contradictory reasons for their elimination, proffering as evidence (although never citing to) only the paper applications of many of the candidates.[10] While Johnson was qualified for the Leadership Apprentice position, a review of the record demonstrates that her credentials alone do not meet the burden articulated in *Byrnie*; that is, Johnson's credentials are not so superior to those of Moreland, Curry, or Cosgrove that no reasonable person, in the exercise of impartial judgment, could have chosen Moreland, Curry, or Cosgrove over Johnson to join the Leadership Apprentice Program.

First, as discussed extensively prior, no evidence in the record indicates that a college degree was necessary for either the LA or the HRC positions. Second, and more importantly, Plaintiff's educational credentials are not so far superior to Moreland's (or to Curry's or Cosgrove's) to have precluded the successful candidates from being hired instead of the Plaintiff. Johnson's

---

[10] Johnson does not mention Cosgrove, the third successful applicant, at all in the argument section of her opposition to DAS's motion. She also fails to mention either Curry or Cosgrove in her complaint.

college degree qualified her for four years of credit toward the minimum six years required to transition from the LA program to the HRC position.  Her Juris Doctor degree, however, did not entitle Johnson to receive a further one year credit under the education substitution scheme because law is not a "closely related field" to public administration or human resources management, a fact Johnson concedes.[11]  Indeed, Johnson testified that her law degree was not a factor that DAS was obligated to weigh in considering her application, or to weigh more heavily as compared to the applications of those candidates without a law degree.  [Dkt. 38-3, P's Depo. p. 65:6-10].  In comparison, Moreland's application reveals that he was in the process of completing his undergraduate degree, pending completion of only one independent study.  Moreland was thus entitled to at least three years (and likely three and a half years) of credit toward the six year minimum requirement for transition to the HRC position, only six months less credit than Plaintiff received.  The difference between the Plaintiff's and Moreland's credentials are thus not so great as to meet the burden articulated in *Byrnie*: the disparity does not demonstrate that no reasonable person could have chosen Moreland over Johnson for the LA position based on educational credentials alone, especially considering that Moreland reported that he had only one independent study to complete before a degree would be conferred.

Plaintiff's work experience also fails to demonstrate that she was a vastly superior candidate to Moreland such that a reasonable person would be obligated

---

[11]    As noted, an applicant could substitute one additional year toward the six year total experiential requirement for the HRC position if the candidate possessed a Master's Degree in public administration, human resources management, or another closely related field.

to choose her for the LA position.  Johnson was self-employed as an attorney for a total of nine years (although she reported on her resume that she performed this position from January 2004 to January 2003, a total of negative one year), during which time she performed legal services including litigation in areas including civil rights, criminal and family law, and personal injury law, and conducted trials and appeals in state and federal courts and agencies.   Although asked on the application, Johnson did not report why she had left this position, even though she reportedly made between $60,000 and $80,000 annually.  Either six or eighteen months after ceasing her employment as a private attorney, depending on which of her listed end and start dates is correct, and for which gap Johnson did not account in her application, Johnson took a part-time job as a bank teller earning $15 per hour.  She listed her duties as "[p]rocess[ing] financial transactions; respond[ing] to customer inquiries; sell[ing] banking products." Plaintiff was employed as a bank teller for six months (although she reported the period to be seven months) before taking a position with the Commission on Human Rights and Opportunities, which she erroneously listed in her cover letter as the Commission on Human Rights and *Responsibilities*.  Johnson was employed at the CHRO as a Representative / Affirmation Action Program Analyst and reported her duties in full as follows: "[i]nvestigate charges of discrimination in employment, public accommodations settings; monitor affirmative action plans and practices of state agencies and private contractors doing business with state agencies."  She had worked for the CHRO for sixteen months before applying for the LA position.

Johnson's prior work experience did not include any professional

experience in classification, compensation, job evaluation, recruitment,

examination, selection, or other closely related areas in the field of human

resources management, which were required for the HRC position.[12]

Undoubtedly, Johnson's prior employment provided transferrable skills useful to

a Leadership Apprentice position, including and especially the ability to

understand and apply state and federal law, statutes, and regulations, which

---

[12]    During her deposition, Johnson testified as follows:
Q:      Your position at the CHRO, as an investigator, were you responsible
in that portion for making any hiring decisions"
A:      No.
Q:      Were you responsible for calculating, or determining any employee's
job classification?
. . . .
A:      No.
Q:      Were you responsible at any time for calculating any employee's
wages, or compensation?
. . . .
A:      No.
. . . .
Q:      Were you ever responsible, in your job as an HRO, to set policies - -
human resource policies for the CHRO?
A:      No.
Q:      Were you ever responsible for . . . putting together the affirmative
action plan for the CHRO, itself?
A:      No.
. . . .
Q:      Were you ever responsible for assessing - - doing any type of
organizational assessment about the functioning of the CHRO, from the
standpoint of the human resource department?
A:      No.
. . . .
Q:      Were you responsible for designing human resource training
programs for the agency?
A:      No.
Q:      Were you ever responsible for - - ever in charge or responsible for
recruitment of new employees for the agency?
A:      No.
[Dkt. 38-3 [or 38-4], P's Depo. pp. 19:17 - 22:10].

Johnson noted in her cover letter.[13]  However, Johnson's application lacked a certain attention to detail in that it contained potentially relevant omissions (her employment during the period between her time as a lawyer and her employment as a bank teller, and her reason for leaving the practice of law), contained several discrepancies in dates, and incorrectly named her then-current employer, all of which may speak to Johnson's written communication skills and her attention to detail.  Her cover letter was also brief, did not explain her skills in any detail, and failed to enumerate why Johnson was seeking a Leadership Apprentice position – an entry level training position – after having engaged for nine years in a professional career wholly distinct from human resources management and which required a specific post-graduate degree.  Johnson's cover letter reads, in relevant part,

> Your review of my past professional experiences will illustrate that I am certainly a desirable candidate especially considering the level of training required for the position.  I am quite capable of learning rapidly how to handle new complex responsibilities.  My past professional experiences both as a litigator and H.R.O. Representative for the Commission on Human Rights and Responsibilities have regularly provided me with exposure to a multitude of difficult tasks which I have executed in an excellent and efficient manner.

> I am also sensitive to handling the private, personnel related needs of employees in a highly professional, discreet and confidential manner.  I am quite familiar with and enjoy studying and interpreting statutes, regulations and employment policies.

---

[13]  "I am quite familiar with and enjoy studying and interpreting statutes, regulations and employment policies."  [Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 1].

[Dkt. 38-5 (pp.3-7) (Exh. C), Johnson App. p. 1].  The Court agrees with the Defendant that this cover letter did not adequately relate Johnson's past experience to the job for which she applied such that she would be an obvious candidate for the position, and appears to suggest that Johnson believed herself to be overqualified for the Leadership Apprentice position, which could in turn suggest that she was not enthusiastic about the position or that she would be unlikely to stay in it if offered.  Defendant is also correct that the application places the onus on the person reviewing it to identify how Johnson's experience is relevant to the LA position.  Therefore, although certainly qualified, the record does not support that Johnson's legal training and career or her recitation of her qualifications distinguished her as a prime candidate for the entry level LA position.

   In contrast, Daniel Moreland's very detailed application and cover letter specifically relate his past work experience to the skills necessary to the Leadership Apprentice position, clearly state his reason for applying for the position, convey his credentials in a manner that appears enthusiastic and fulsome, and explain his past professional experiences in detail.  Unlike Johnson, Moreland articulated in detail in both his cover letter and his application form his responsibilities in his various positions of employment and how his responsibilities and experiences had developed various skills.  For instance, Moreland explained that serving as an executive administrative support professional for the Governor's Office had led to his development of an in-depth knowledge of state government and its actors and programs and had allowed him

to interact daily with a variety of officials on the state, federal, municipal and corporate levels.  Moreland also explained that he had had to implement his leadership skills in assisting in the development and facilitation of the Governor's Hurricane Katrina Evacuee Relocation Plan, while his explanation of his position as the Official Statement Writer for the Governor underlines his written and oral communication skills.  Moreland's listing of his past professional experiences boasts no time gaps and is equally as detailed.  Moreover, Moreland's application does not suggest that he believes himself to be overqualified for the LA position; rather, it conveys an enthusiasm that is absent in Johnson's submission.  Surely the presentation of one's credentials speaks to a skill in and of itself; although Moreland and Johnson were both qualified for the LA position, Moreland's stands out for its tone.  After a close review of Johnson's and Moreland's applications, this Court cannot say that Johnson's credentials were so superior to Moreland's that no reasonable person, in the exercise of impartial judgment, could have chosen Moreland over the Plaintiff for the LA position.  Consequently, Johnson's subjective disagreement with the DAS's business decision not to hire her based on a review of her application does not create an issue of material fact on the issue of pretext.

Plaintiff's argument that DAS offered conflicting reasons for her non-hire while lauding Moreland's legislative experience and ability to interpret statutes and regulations is equally unavailing in demonstrating pretext.  Johnson asserts that DAS at once believed her to be overqualified for the LA position and unsuitable for the position because of her lack of human resources management

experience. Even if this assertion is true, the two reasons are not mutually exclusive. As discussed, Johnson had nine years of professional experience in law, a profession separate from human resources but that likely developed Johnson's skills in interpreting statutes and regulations. However, the LA positions were entry level training positions. While Johnson was technically qualified for the position, DAS has asserted that it was wary of Johnson's application because her lengthy experience in a wholly distinct profession made it appear more likely that Johnson would not be content performing the tasks necessary for the LA position, which would in turn make it more likely that she would not remain in the position. Further, Johnson did not have prior experience in human resources management. Had she possessed such experience, rather than possessing experience in law, a reasonable person could conclude that she would be more likely to stay in a Leadership Apprentice position and then in a Human Resources Consultant position. DAS has not stated that Johnson was unqualified to be a Leadership Apprentice; rather it has noted that Johnson's prior work experience – extensive as it was – was "unsuitable for position." It is perfectly reasonable based on a review of Plaintiff's application package to deem her experience to be unsuitable for an entry level training position precisely because this high-level but non-human resources management experience could have led her to be a bored and brief Leadership Apprentice. These two positions are not contradictory, especially coupled with Plaintiff's non-presentation of any reason for her desire to become a Leadership Apprentice.

Further, although allegations that Plaintiff was better suited for the LA position than both Daniel Curry and Michael Cosgrove appear *nowhere in her complaint* and Plaintiff only very briefly addresses Curry's credentials in her opposition motion, the Court notes that the record does not support any inference that Johnson's credentials were so far superior to Curry's or to Cosgrove's that a rational person would never have chosen them for the position over Johnson. Indeed, Plaintiff nowhere claims that Cosgrove was less qualified than she for the LA position, and seems only to take fleeting umbrage with Curry's selection. As such, the Court will briefly review the evidentiary record as to Curry and Cosgrove.

Michael Cosgrove possessed a bachelor's degree entitling him to four years of credit toward the HRC position and, at the time of his application, Daniel Curry was less than two months from obtaining his bachelor's degree, entitling him also to four years of credit by the time of his hire, putting both Cosgrove and Curry on par with Johnson's academic credentials for purposes of the LA position. [Dkt. 46-3 (pp.8-12) Cosgrove App. pp.2, 3; Dkt. 46-3 (pp.2-5) Curry App. p.1]. Curry, although a recent college graduate lacking professional experience at the time of his hire, had completed his undergraduate degree work in the field of Human Resources Management. [Dkt. 46-3 (pp.2-5) Curry App. p.1]. Curry had also spent the summer prior to his application as a Summer Worker with the Statewide Human Resources unit within the DAS. [Dkt. 46-3 (pp.2-5) Curry App. p.2]. Libby, who selected Curry for an interview, affirmed that Curry was an attractive candidate because of his bachelor's degree in Human Resources

Management and his prior experience at DAS, which she believed provided him with the background to be successful in the LA Program. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶22a]. Libby attested that she knew that Curry "was reliable, had great computer skills, produced high quality work product, and worked efficiently." [*Id.*]. The AA Report notes that Curry was selected because of his degree, his prior work experience with DAS, and an "[e]xcellent reference from Department Chair at Western N.E. College." [Dkt. 38-6 (pp.11-13) (Exh. M), AA Report]. Given that the LA Program is an entry level training position, it is not surprising that a relatively inexperienced applicant who possessed a degree in the training area toward which the Program was specifically geared was offered a position. Johnson possessed more sheer work experience at the time of her application but boasted no human resources management credentials; Curry, on the other hand, boasted little work experience, but a degree in human resources management. This scenario is a prime example of one where "the court must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie*, 243 F.3d at 103 (citations omitted).

Michael Cosgrove (with whom Plaintiff appears not to take issue) possessed a bachelor's degree cum laude in journalism and political science and a master's degree in journalism. [Dkt. 46-3 (pp.8-12) Cosgrove App. p.2]. He held several journalism, reporting, and information jobs between 2000 and 2005 for which he researched material, interviewed interested parties, wrote news stories and prepared press releases and other materials for various sporting events, updated and maintained websites, and managed budgets and expenditures. [*Id.*

at pp.4-5].  Cosgrove also trained with the Careers Trainee program at the Office of the State Comptroller, with a target class of Retirement and Benefits Officer, during which time he advised members on retirement benefits and performed payroll functions.  [*Id*. at 2].  Cosgrove's very detailed cover letter stated his interest in "pursuing a career in the field of Human Resources" and proceeded to explicitly relate his past work experience to this goal.  Specifically, Cosgrove noted that his journalism degree programs allowed him to learn "how to conduct research, analyze issues and communicate both verbally and in writing, all skills required to be successful in the field of Human Resources."  Cosgrove also relayed that his positions as a graduate assistant in journalism, an assistant in the Athletic Communications Office at a university, and a reporter and correspondent for various publications had provided him with opportunities to "research and analyze information, write clearly and concisely, enhance [his] computer skills, formulate and manage a budget and work effectively with people to reach a common goal."  [*Id*. at 1].  Libby affirmed that she chose to interview Cosgrove because he had "personnel experience working with the State Office of the Comptroller in the retirement and benefits area, advising employees about their benefit entitlements and performing some payroll functions," demonstrated attention to detail, and had "experience with the unique processes" used in Connecticut state human resources.  Libby also attested that she felt his educational background in journalism and work experience as a reporter would be helpful in interviewing employees about their job duties and in writing clearly. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶22b].  In short, nothing in the record

indicates that Cosgrove was less qualified than the Plaintiff for the LA position, or that Johnson's credentials were so vastly superior to Cosgrove's that no reasonable person would have hired him over Johnson.

The evidence discussed at length in relation to Plaintiff's prima facie case also fails to support her assertion that DAS's reasons for her non-selection were a pretext for racial discrimination. In review, Plaintiff has presented no evidence that a college degree was required for either the HRC or the LA position, no evidence that Moreland was unqualified for the LA openings, no evidence that a special condition was created that allowed Moreland to be hired into the LA Program, no evidence that six of the minority applicants with whom Plaintiff seeks to compare Moreland may be used as comparators, and no evidence that DAS misapplied its affirmative action goals in any way. The Plaintiff has thus offered no evidence to refute DAS's facially legitimate and non-discriminatory reasons.

In sum, the evidence in the record, taken in the light most favorable to Plaintiff, at best shows that DAS – at the time it neglected to hire the Plaintiff – was choosing between a number of qualified applicants. The record fails to demonstrate that Johnson's application was so far superior to those of the successful candidates that no reasonable person could have chosen Moreland, Curry, or Cosgrove over the Plaintiff. The Court therefore "must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie*, 243 F.3d at 103 (citations omitted); *Pippin*, 660 F. Supp. 2d at 366 (quoting same). *See also Newsom-Lang*, 80 F. App'x at 126 ("The law is well-established that

federal courts hearing discrimination claims do not sit as a super-personnel department to reexamine a firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions.") (internal quotation marks and citations omitted). Thus, because Johnson has not proffered "sufficient evidence to find that the employer's asserted justification [for her non-hire] is false," summary judgment is GRANTED as to her racial discrimination in failure to hire claim. *Reeves,* 530 U.S. at 135.

### b. Title VII Retaliation

Johnson alleges that she was not hired for the LA position at DAS in retaliation for her prior protected activity against the CHRO and DAS Commissioner Yelmini. [Dkt. 32, Am. Compl. ¶12]. Plaintiff engaged in three instances of protected activity, the first two of which occurred prior to the DAS decision not to interview and hire Johnson for the LA position and the third of which was not filed until after the LA positions had been filled by persons other than the Plaintiff. First, Johnson gave a statement to a CHRO investigator in connection with an internal investigation of discrimination at the CHRO. Second, Johnson filed a complaint against the CHRO with the EEOC alleging retaliation for making the statement during the administrative investigation and, after she did not get the LA position with DAS, amended her complaint to allege that Yelmini participated in the retaliatory conduct by failing to hire her for the LA position. In support of her first claim, Johnson asserts that Yelmini knew of her protected activity because she reviewed the record of the internal investigation and found it to have been professionally conducted, although Yelmini criticized

CHRO policies and practices and admonished the agency to be mindful and tolerant of its employees' grievance rights. In support of her second claim Johnson cites the fact that Yelmini approved the presumptive hires for the DAS positions from among the applicants chosen to be interviewed, and she signed an AA Report after the hiring decisions had been finalized.

Under Title VII, it is unlawful for an employer to discriminate against an applicant for employment because that applicant "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The burden-shifting framework laid out in *McDonnell Douglas*, 411 U.S. at 802, governs retaliation claims under Title VII. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). To establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) that the defendant took adverse employment action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Id.* at 125; *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). The Supreme Court has recently held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). Thus, the establishment of a causal connection between the protected activity and the adverse action "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action

or actions of the employer." *Id.* at 2533. "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action. If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Summa*, 708 F.3d at 125 (internal quotation marks and citations omitted).

On February 14, 2006, Johnson filed with the EEOC a complaint of discrimination against the CHRO and several of its employees. The complaint was received by the EEOC's Philadelphia office on March 13, 2006. Neither the DAS, Yelmini, Libby, nor Anderson was a respondent to this complaint, and none was mentioned in Johnson's allegations. On April 5, 2006, Johnson submitted to DAS her application for the LA position for which she was not selected. On July 24, 2006, after Johnson had applied for and had not been selected for the LA position, she filed an Amended Complaint Affidavit with the EEOC, adding allegations against, but not naming as a respondent, DAS Commissioner Yelmini. In August of 2006 Yelmini signed an AA Report culminating the hiring process for the DAS positions.

Johnson has failed to make out a prima facie case of retaliation because she fails to offer any evidence that Yelmini was aware of her candidacy for the LA position. In addition Johnson has failed to produce evidence that Yelmini was aware of Johnson's protected statement given in connection with a CHRO internal investigation or of Johnson's EEOC retaliation complaint against the

CHRO at the time DAS declined to hire her. Further, Johnson did not amend her EEOC complaint against the CHRO to attribute conduct to Yelmini until after DAS made its hiring decision and chose not to hire her. The record shows that DAS Commissioner Yelmini was not involved in reviewing applications for, selecting interviewees for, or selecting the ultimate candidates to fill the LA position. [Dkt. 38-5 (pp.52-58) (Exh. I), Libby Aff. ¶29; Dkt. 38-6 (pp.1-2) (Exh. K), Yelmini Aff. ¶¶5,6]. Yelmini's involvement was limited to receiving briefing from Libby as to the six applicants who had been interviewed for the open positions. There is no evidence that she was aware of candidates who were not selected to be interviewed. Both Yelmini and Libby affirmed that they discussed only the candidates who had interviewed and not any applicants who had not been interviewed. Yelmini later approved the decision to hire the candidates Libby recommended. The earliest date on which the evidence shows that Yelmini could have become aware of the Plaintiff's candidacy was August of 2006 when she signed the AA Report listing the names of all 26 applicants and interviewees, including Johnson. Yelmini did not sign the report until three months after DAS declined to hire the Plaintiff and instead hired Curry, Cosgrove, and Moreland. Yelmini has further affirmed that she was not aware that Johnson had applied for the LA position until after the hiring decision had been made and the offers had been extended and accepted. Lastly, both Libby and Anderson, the DAS employees who had been responsible for reviewing applications and choosing interviewees, attested that they were not aware of Plaintiff's involvement with complaints made against the CHRO at the time they made their hiring decisions

for the three open positions at issue here.  [Dkt. 38-1, D's 56(a)1 Stmnt. ¶64].

Plaintiff has offered no evidence to the contrary.  Nor has the Plaintiff presented

any evidence in the record to suggest (nor has she alleged) that Anderson or

Libby knew of Johnson's EEOC complaint or any protected activity when they

declined to select Johnson for an interview.[14]

There is nominal evidence that Yelmini may have known of Johnson's

protected activity.  The Defendant notes that Johnson attached to her July 24,

2006 Amended EEOC charge a letter dated February 14, 2006 from Yelmini to

CHRO Executive Director Ingram (a respondent in the EEOC action) and a letter

from Ingram to Yelmini dated February 27, 2006 regarding two complaints which

had been lodged against Ingram by two of Johnson's CHRO coworkers and in

which Johnson was a fact witness.  Yelmini's letter stated she reviewed the

CHRO internal investigations of Johnson's co-workers' complaints in connection

with which Johnson made a statement.  Johnson has not included the

investigation as part of the record in this case and there is nothing in the record

which indicates that the report of the investigations referenced Johnson or her

statement.  Yelmini's letter states that the investigations "appear to have been

conducted in a professional manner" and in accordance with procedures.  This

language suggests that Yelmini's focus was on CHRO policy and procedures and

not on the substance of the investigation.  However, the letter goes on to criticize

the content of certain routine communications of CHRO staff, suggesting the

review was both procedural and substantive.  Yelmini's letter admonished CHRO

_____

[14]      In fact, the Plaintiff has failed to address in any way DAS's arguments as to
her claim of retaliation in her opposition to DAS's motion for summary judgment.

72

that employees have the right to file grievances pursuant to their collective bargaining agreement, that the grievance process was designed to resolve complaints, that it was important to manage change in accordance with the collective bargaining agreement, and finally that it was "also important to remember that no adverse action can result to individuals based upon the exercise of their rights in a legitimate manner."

Nonetheless, Plaintiff has failed to come forward with facts – as opposed to conjecture – that Yelmini was aware of her protected statement.  This correspondence nowhere mentions the Plaintiff or her involvement in any investigations, nor does it note the scope of the investigatory reports produced by the CHRO or the scope of the review performed by Yelmini's staff.  The letters are the only evidence in the record offered by Johnson to establish Yelmini's knowledge of her protected statement and they do not mention of the Plaintiff much less her protected statement.

Even if Yelmini was aware of Plaintiff's statement, Yelmini's awareness is of no consequence because as stated above, there is no evidence that Yelmini had any input in the decision not to interview and ultimately not to hire Johnson. The earliest date on which Yelmini could have known that Johnson had applied for the LA position was in August 2006, when Yelmini signed the AA Report.  That was after the hiring decisions had been made and the offers to Moreland, Curry, and Cosgrove had been extended and accepted.  Thus, the competent evidence in the record suggests that Yelmini was not aware of Johnson's application for the LA position until all three positions had been filled.

Finally, Johnson did not amend her EEOC complaint to allege Yelmini's involvement in the CHRO retaliation until months after the hiring process was complete.  Further, Johnson did not name Yelmini as a respondent and there is no evidence that Yelmini was served with the amended complaint or otherwise made aware of the allegations.  Thus, Johnson has failed to show that Yelmini did not select her for the LA position or that she did so in retaliation for Johnson's amended EEOC complaint.

The Plaintiff has thus failed to meet the second, third, and fourth prongs of her prima facie case of retaliation. Specifically Johnson has failed to present evidence to establish that Yelmini knew of her protected activity, that Yelmini took an adverse employment action against her, or that there was a causal connection between any of her protected activities and DAS's failure to hire her for the LA position.  As such, summary judgment is GRANTED as to this claim.

### VI.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in full.  The Clerk is directed to enter judgment in favor of Defendant and to close this case.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: September 13, 2013